UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

_____

CARA CASTRONUOVA,

                  PLAINTIFF,

     -against-                                COMPLAINT

META PLATFORMS, INC. , X CORP.,
VIVEK MURTHY in his official capacity as
United States Surgeon General; JOSEPH              Jury Trial Demanded
R. BIDEN, JR.  in his official Capacity
as President of the United States;

                DEFENDANTS.

_____

## INTRODUCTION

1.      In the US Supreme Court case *Packingham v. North Carolina,* Justice Kennedy discussed the relationship between Twitter and the First Amendment. He said that "[w]hile in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the vast democratic forums of the Internet in general, and social media in particular. . . . [O]n Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner. . . . In short, social media users employ these websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought." 137 S. Ct. 1730, 1735-36, 198 L. Ed. 2d 273 (2017).

2.      Defendants conspired to remove from the internet social media posts by the Plaintiff, Cara Castronuova ("Castronuova"), because they disagreed with her viewpoints – albeit viewpoints shared by millions of Americans.

3.      Castronuova brings her action to defend the freedom of speech from viewpoint-based, discriminatory collusion between private social media companies and the federal government. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of  the Univ. of Va.*, 515 U.S. 819, 828 (1995). Under the Free Speech Clause of the First Amendment, discrimination against speech because of its message is presumed to be unconstitutional.

4.      When the federal government admits to conspiring with social media companies to censor messages with which it disagrees, as we are learned it has in this case and apparently in numerous others, both the  government  and  the  private  companies  are  guilty of unconstitutional viewpoint discrimination:  Joint  action  exists  where  the  government encourages unconstitutional conduct through its involvement with a private party. *Wheatley v. New York State United Teachers, New Hartford Employees Union*, 629 F. Supp. 3d 18 (EDNY, 2022); *Hannan v. Rose*, 2020 U.S. Dist. LEXIS 68436 (SDNY April 17, 2020); *Ohno v. Yasuma*, 723 F.3d 984, 996 (9th Cir. 2013).

5.      This Court should declare the actions of Defendants Facebook, Twitter, President Biden, and Surgeon General Murthy unconstitutional and permanently enjoin them from monitoring, flagging, shadow banning and deleting social media posts based on the viewpoints the posts espouse.

6.      Defendant Facebook, Inc. violated Castronuova's right to Free Speech under the US Constitution when they deprived her of an essential and invaluable forum for speaking her mind by without any warning whatsoever closed Castronuova's Facebook account.

7.      Defendant Facebook, Inc. is liable for promissory estoppel for promising Castronuova the use of its social media platforms to further her business interests and then rescinding this promise after she relied on them to her detriment.

8.      Twitter, in more insidious fashion, has severely shadow banned Castronuova's Twitter account, such that, since about November 2020, and up till the present day, her posts cannot be seen by anyone who was not already following her, and any post or information she sends from her Twitter account is flagged as "dangerous", are hidden, or simply blocked altogether.

## PARTIES

9.      Plaintiff, Castronuova, is a natural person domiciled in Nassau County, New York.

10.     Defendant Meta Platforms, Inc., formerly Facebook, Inc. (hereinafter referred to collectively as "Facebook"), is a corporation incorporated in numerous states, and with a principal place of business at 1601 Willow Road, Menlo Park, California.

11.     Defendant X Corp., formerly Twitter (hereinafter referred to as "Twitter"), is a social media company based in San Francisco, California with a principal place of business at 1355 Market Street, Suite 900, San Francisco, California 94103 and referred to herein together with Facebook, collectively.

12.     Defendant Vivek Murthy is sued in his official capacity as the Surgeon General

of the United States. In that role, he directs the office of the Surgeon General.

13.     Defendant Joseph R. Biden, Jr. is sued in his official capacity as the President of the United States. In that role, he directs the executive branch of the federal government, including White House staff.

14.     This Court has jurisdiction to issue injunctive relief to protect constitutional rights. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

15.     The Court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. § 2201 and to order further necessary or proper relief based on a declaratory judgment or decree pursuant to 28 U.S.C. § 2202.

16.     The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

17.     The Court has personal jurisdiction over Defendants Murthy and Biden because they are officers or agencies of the United States.

18.     The Court has personal jurisdiction over Defendants Facebook and Twitter because they derive significant business in New York and maintain offices in New York.

19.     Plaintiff Castronuova is a public figure, initially as an athlete and actress, and eventually moving into journalism as a reporter at The Gateway Pundit and Newsmax, both are generally considered conservative news outlets.

20.     In recent years, Plaintiff Castronuova has become active politically.

21.     In 2020, Castronuova appeared on *Fox & Friends* and other news outlets speaking about her political movement "Liberate New York".

22.     She was recognized by President Donald Trump for her work in political activism on hers Twitter account before it was shut down.

23.     She was one of the organizers of the "Justice for J6" rally, a September 18, 2021 rally in Washington, D.C. in support of those arrested for the January 6 United States Capitol demonstrations.

24.     She paired with the organization "Look Ahead America," its founder Matt Braynard and on behalf of both organizations they filed a formal complaint with the United Nations Human Rights Committee regarding the January 6 prisoners. Braynard and Castronuova also worked together to hold rallies in Washington, D.C. and in 17 states between 19 June 2021 and 2 October 2021.

25.     The Plaintiff's "Cara Castronuova" main Facebook account was suspended permanently without any warning whatsoever after those rallies.

26.     Underneath that main account, the Plaintiff was previously able to open other special interest "Pages".

27.     The Pages where the Plaintiff's fitness fan page as well as her political activist Public Figure fan page. The Plaintiff lost control of these accounts as well once the personal account was suspended because Facebook makes it that you can no longer login or access your "Pages" if you cannot login to your original account. These Pages also have been also deleted from Facebook. The Plaintiff also lost access to the political "Group Page" she started called Liberate New York. Liberate New York was started to oppose the lockdowns, mandates and vaccines.

28.     As a journalist and activist, Castronuova's network was incredibly important. Castronuova was organizing first amendment protected Free Speech Rallies and protests at the time and she used Facebook to advertise rallies and protests. It was incredibly important at the time because it was during and right after the lockdowns and people were still afraid to go out.  The only way that one could connect to people without a corporate advertising budget was on Facebook.

29.     Castronuova also used her Facebook account to operate a group called Liberate New York, which originated as a group of citizens opposed to the lockdowns in New York. The Plaintiff abruptly lost control of that account as well after Facebook removed her account. The purpose of that "Group Page" was to galvanize others that were like-minded to peacefully protest lockdowns and vaccine mandates.

30.     Castronuova is also a licensed real estate agent. Castronuova depended on her Facebook account to maintain contacts. Facebook was absolutely necessary in that endeavor. After the sudden cancellation in or about October 7, 2021, Castronuova found it incredibly difficult to jumpstart a career in Real Estate because she completely lost touch with thousands of contacts- both business and personal- that were reliant on Facebook.  Maintaining these relationships were fundamental to Castronuova's real estate career.

31.     Castronuova also was running for public office at the time her Facebook account was cancelled. Castronuova found the cancellation of her Facebook account to have been extremely harmful to her campaign as she was cut off from communicating with her community, local businesses, established friends and supporters, and from contacting new supporters. The

harm was irreparable and Castronuova lost a close political race to an opponent who had full access to Facebook.

32.     At around the time of the cancellation of Castronuova's Facebook account, the administration of Defendant Biden revealed publicly that it is directing social media companies to remove posts it deems to be "spreading misinformation regarding COVID-19."

33.     The Plaintiff was at the same time shadow-banned by Twitter. It has perhaps been much more insidious Twitter's treatment of the Plaintiff. Rather than outright cancelling her account, she has been severely shadow banned, also without any notice or justification. It has become apparent that no postings or forwards are permitted to be seen – up until the present day.

34.      For example, when she attempts to send a message out, it is automatically flagged as "suspicious content" (see Exhibit 1), or when she tried to post her account suddenly requires a password change (see Exhibit 2) or when she attempts to forward someone else's tweet, it simply does not forward (see Exhibit 3).

35.     On July 15, 2021, at a White House Press Conference, Defendant Murthy stated, "We're asking [our technology companies] to consistently take action against misinformation super-spreaders on their platforms."

36.     White House Press Secretary Jen Psaki admitted, "We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation."

37.     Psaki also revealed that the White House effort to suppress free speech reaches all

the way to the level of senior staff for Defendant Biden.

38.     Psaki gave a glimpse of how the scheme works: "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team"

39.     The next day she revealed that the far-reaching effort targeted multiple posts on multiple social media sites: "You shouldn't be banned from one platform and not others."

40.     Defendants Biden and Murthy directed four key changes for social media platforms. The first is that the companies "measure and publicly share the impact of misinformation on their platform."

41.     Second, Biden and Murthy directed companies to "create a robust enforcement strategy that bridges their properties and provides transparency about the rules."

42.     Third, Biden and Murthy stressed that "it's important to take faster action against harmful posts" because "information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts."

43.     Fourth, Biden and Murthy directed Facebook to "promote quality information in their feed algorithm."

44.     At the direction of Biden, Murthy created and published an entire 22-page Advisory with instructions on how social media companies should remove posts with which Murthy and Biden disagree.

45.     Biden further threatened social media companies who do not comply with his directives by publicly shaming and humiliating them, stating, "They're killing people."

46.     On information and belief, Defendants Biden and Murthy directed Defendants Facebook and Twitter to remove Castronuova's social media posts because they disagreed with the viewpoints she espoused in them and conspired with Facebook and Twitter to do so.

47.     Indeed, the actions suggest political animus on the part of the Defendants against Castronuova for espousing beliefs also held by millions of Americans.

48.     Defendant Facebook is one of the most popular social media sites. It boasts "more than 2.8 billion monthly users worldwide," who use it for both business and pleasure. Almost 70% of Americans use Facebook in some capacity.  Of these users. 70% visit Facebook daily.

49.     Facebook's services involve creating a sort of personal website for its users who can post pictures of themselves and others, create posts on their wall where they can "debate religion and politics with their friends and neighbors or share vacation photos." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). These posts can also include links to news articles and videos.

50.     Other users can post comments on a user's posts and, thereby, have a dialogue with one other. Users may also send each other direct messages through Facebook's Messenger feature. Given this tremendous opportunity to network and speak with other people throughout the United States and even the world, users frequently use it to promote their business. "There are over 60 million active business [p]ages" on Facebook.  Millions of businesses pay to be active

advertisers.

51.     Facebook's hosting of advertisements is very lucrative for it. In 2018, it generated a total of $55.8 billion in revenue, and 99% of that came from ads on Facebook and other platforms that it owns, such as Instagram.

52.     Facebook's terms of service invites businesses to use its services to "connect with [other people], build communities, and grow businesses."

53.     The terms of service require users to follow its "Community Standards." Those standards state that Facebook is "a service for more than two billion people to freely express themselves across countries and cultures and in dozens of languages." They go on to state, "To ensure that everyone's voice is valued, we take great care to craft policies that are inclusive of different views and beliefs, in particular those of people and communities that might otherwise be overlooked or marginalized."

54.     The limits on this pro-free speech stance include abstract categories such as "Violence and Criminal Behavior," "Safety" (which includes "Suicide and Self-Injury," "Child Sexual Exploitation, Abuse, and Nudity," "Sexual Exploitation of Adults," "Bullying and Harassment," "Human Exploitation," and "Privacy Violations and Image Privacy Rights), "Objectionable Content" (which includes "Hate Speech," "Violent and Graphic Content," "Adult Nudity and Sexual Activity," and "Sexual Solicitation"), "Integrity and Authenticity," (which includes "Account Integrity and Authentic Identity," "Spam," "Cybersecurity," "Inauthentic Behavior," "False News," "Manipulated Media," and "Memorialization"), and "Respecting Intellectual Property." For the "False News" sub-category, Facebook states that "we do not remove false news from Facebook but we significantly reduce its distribution by showing it lower

in News Feed."

55.     Castronuova used her Facebook account as a feeder for her other social media accounts, as a networking tool for her businesses, and as a promotion for her online websites and activities as a journalist and activist.

56.     Given Castronuova's use of Facebook for her business, her use of Facebook has been essential to promote her brand and business. Over the years, Castronuova has spent thousands of dollars on Facebook advertisements.

57.     Losing the ability to connect with people through her Facebook account, and the shadow banning of her Twitter account, has harmed Castronuova's business and work to help others. She is also suffering irreparable injury to her reputation after being "kicked off Facebook" and humiliated in the square of public opinion.

58.     "Our legal system and its British predecessor have long subjected certain businesses, known as common carriers, to special regulations, including a general requirement to serve all comers." *Biden v. Knight*, 141 S. Ct. 1220; 209 L. Ed. 2d 519 (2021), Justifications for these regulations have varied. Id.

59.     Some scholars  have argued that common-carrier regulations are justified only when a carrier possesses substantial market power. *Id*. Others have said that no substantial market power is needed so long as  the company holds itself out as open to the public. *Id*.; *see also Ingate v. Christie*, 3 Car. & K. 61, 63, 175 Eng. Rep. 463, 464 (N. P. 1850) ("[A] person [who] holds Herself out to carry goods for everyone as a business . . . is a common carrier").

60.     The Supreme Court has found that regulations like those placed on common

carriers may be justified,  even  for industries not historically recognized as common carriers, when "a business, by circumstances and its nature, . . . rise[s] from private to be of public concern." *See  German Alliance Ins. Co. v. Lewis*, 233 U. S. 389, 411, 34 S. Ct. 612, 58 L. Ed. 1011 (1914) (affirming state regulation of fire insurance rates). At that point, a company's "property is but its instrument, the means of rendering the service which has become of public interest." Id., at 408, 34 S. Ct. 612, 58 L. Ed. 1011.

61.     Within the last year, extensive information, previously kept secret, about the extent of collusion between the platforms (Facebook and Twitter) and the Biden administration has come to light. *See* Exhibit 4, *New evidence proves Biden administration pressured Facebook and Twitter to censor Americans,* Liberty Justice Center, Oct. 21, 2022*. (Available at-https://libertyjusticecenter.org/pressrelease/social-media-censorship)*.

62.     The wrongful acts that have come to light in the last year include the following:

•   Facebook offered the federal government, and it accepted, $15 million in free COVID-19 public health advertising to promote its public health message on the Internet.

•   The Centers for Disease Control and Prevention (CDC) and Biden administration officials coordinated its COVID "misinformation" response with Facebook and Twitter by holding regular "be-on-the-lookout" meetings and by providing examples of the types of messages that contradicted the government's message and it wanted censored.

•   Facebook used proprietary tools to monitor social media posts that contradicted

the federal government's COVID-19 narrative and reported such posts to the

federal government.

• Facebook adjusted its policies and algorithms to align with misinformation

policies set by the federal government.

63.    In July 2023, Rep. Jim Jordan revealed publicly an internal email from April

2021 that a Facebook employee circulated to, *inter alia,* then Facebook CEO Mark Zuckerberg,

saying "We are facing continued pressure from external stakeholders, including the [Biden]

White House…to remove COVID-19 vaccine discouraging content."  *See* Exhibit 5.

**COUNT I - Free Speech**
**Murthy, Biden, Facebook and Twitter violated the Free Speech clause of the First**
**Amendment when they acted jointly to remove Castronuova's social media posts, block**
**her from using her accounts and/or "shadow ban" her**

64.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 63 as if

fully set forth herein.

65.    "The First Amendment is a kind of Equal Protection Clause for ideas." *Barr v. Am.*

*Ass'n of Political Consultants*, 140 S. Ct. 2335, 2354 (2020). A government violates this promise

of equal treatment for ideas when it engages in viewpoint discrimination. *Rosenberger*, 515

U.S. at 819. Murthy and Biden engaged in viewpoint discrimination when they directed

Facebook and Twitter to remove social media posts like those of Castronuova that contained

a viewpoint on COVID-19 that did not fit with their own political narrative.

66.    "Every citizen may freely speak, write and publish his or her sentiments on all

subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or

abridge the liberty of speech or of the press." (*Matter of Walton v New York State Dept. of*

*Correctional Servs.*, 13 NY3d 475, 490, 921 NE2d 145, 893 NYS2d 453 (2009)).

67.     New York's Constitution thus defines a broader scope of protection for freedom of expression than the United States Constitution. (*People v Pavone*, 26 NY3d 629, 639, 26 NYS3d 728, 47 NE3d 56 [2015]; *Matter of Children of Bedford v Petromelis*, 77 NY2d 713, 731, 573 NE2d 541, 570 NYS2d 453 [1991]; *Immuno AG. v Moor-Jankowski*, 77 NY2d 235, 249, 567 NE2d 1270, 566 NYS2d 906 [****3]  [1991]; *People ex rel. Arcara v Cloud Books*, 68 NY2d 553, 557-558, 503 NE2d 492, 510 NYS2d 844  [1986]; *see Matter of Town of Islip v Caviglia*, 73 NY2d 544, 556, 540 NE2d 215, 542 NYS2d 139 [1989].)

68.     Private companies engage in state action when they work with government officials to deprive individuals of their constitutional rights. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 942 (1982).

69.     Facebook and Twitter engaged in state action when they removed posts like Castronuova's at the request of Murthy and Biden based on the viewpoint of those posts.

70.     Facebook worked in concert and/or conspiracy with Murthy and Biden to deprive Castronuova of her First Amendment right to Free Speech.

71.     Murthy and Biden affirmed, authorized, encouraged, and/or facilitated Facebook unconstitutional conduct of censorship.

72.     Facebook was either willful participants when they removed posts based on their viewpoint at the direction of Murthy and Biden or they were subject to government compulsion, either of which amounts to state action.

73.     Murthy and Biden knowingly accepted the benefits of censored speech derived

from the unconstitutional behavior of Facebook and Twitter in removing or blocking posts based on a viewpoint with which Murthy and Biden disagreed.

74.     Facebook and Twitter now require that Castronuova and other users express a government-approved viewpoint to use their platforms.

75.     Castronuova is entitled to declaratory and injunctive relief against Murthy and Biden for violating hers right to Free Speech.

76.     Castronuova is entitled to declaratory and injunctive relief as well as compensatory and nominal damages from Facebook and Twitter for violating her right to Free Speech.

**COUNT II**

**Federal Statutory Claims under 42 U.S.C. § 1983, 42 U.S.C.S. § 1985(3) for Violation of the Plaintiff's First Amendment Rights Against All Defendants**

77.     Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 76 as if fully set forth herein.

78.     At all times relevant to this Complaint, the government Defendants were acting under color of law.

79.     There is an inextricable nexus between the various Defendants, and as such all Defendants, public and private, are willful participants in depriving the Plaintiff of his rights, and as such the Defendants have a symbiotic relationship for purposes of 42 U.S.C. § 1983.

80.     As a result of this nexus, all acts by all the Defendants relate to Plaintiff's claims under 42 U.S.C. § 1983 et al.

81.     All of the wrongful acts or omissions complained of herein against Plaintiff were carried out by the named Defendants.

82.     As a result of the foregoing the Plaintiff is now unable to resume the free exercise of her First Amendment rights.

83.     As a result of the foregoing, Plaintiff has suffered injuries and damages, and as such, the Plaintiff claims compensatory damages for harm to the Plaintiff, punitive damages, and additional compensatory damages based on value of constitutional rights, pursuant to which a jury is permitted to award damages based on its own unguided estimation of value of such rights.

### COUNT III - Free Speech

**Facebook and Twitter violated the Free Speech when they blocked/shadowbanned Castronuova's speech at the behest of Government agents/officials**

84.      Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 83 as if fully set forth herein.

85.     Facebook and Twitter are common carriers of information and are not able to suppress speech based on viewpoint.

86.     The U.S. Supreme Court made a similar observation about the internet in *Packingham*, 137 S. Ct. at 1735. There, the Court compared social media to a "quintessential forum" for engaging in speech such as "a street or park." It further found that the most important forum today for speech is "cyberspace-the 'vast democratic forums of the Internet' in general . . . and social media in particular." *fd.* (quoting *Reno v. American Civil Liberties Union*, 521 U. S. 844, 868, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997)). Social media platforms are the modern-day town square.

87.     The Plaintiff's claim here is distinguishable, and not controlled by, the decision in *Wagschal v. Skoufis*, 442 F. Supp. 3d 612 (SDNY 2020) wherein the court found that it would not violate the first amendment rights of a constituent (the plaintiff) to be blocked from posting on the personal social media page of his elected state representative. The constituent was not barred from using the platform, nor constained from posting on his own account, nor shadow banned.

88.     Because Facebook provided an essential and invaluable forum for exercising Castronuova's right to Free Speech under the Constitution, it violated such right when they removed posts and suspended her ability to speak on their platforms.

89.     Similarly, Twitter's shadow banning, which continues to today, violated such right when they removed posts and suspended her ability to speak on their platforms

90.     Plaintiff is entitled to declaratory and injunctive relief as well as compensation.

## COUNT IV – Promissory Estoppel

**Facebook Committed Promissory Estoppel By Not Fulfilling Their Promise For Castronuova To Use Their Platform For Her Business.**

91.     The Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 90 as if fully set forth herein.

92.     Facebook made "a clear and unambiguous promise" to Castronuova that she could use their services to communicate and network with other Facebook users.

93.     Facebook and Twitter did not caveat this promise by announcing that they would censor speech opposing masks.

94.      Castronuova engaged in "reasonable, foreseeable and detrimental reliance" on Facebook's and Twitter's promise when he started using their services to speak with and network with other Facebook and Twitter users to promote her business.

95.      Castronuova engaged in "reasonable, foreseeable and detrimental reliance" on Facebook's promise when she invested substantial sums of money to advertise on Facebook and Twitter.

96.      Facebook's removal and flagging of Castronuova's posts and suspension of hers account for engaging in speech caused her reliance on their promises to be to the detriment of her business, finances, and reputation.

97.      As the result of this detrimental reliance, Castronuova suffered monetary  and non-monetary damages.

### COUNT V - Intentional Interference with Contract

**Facebook and Twitter committed intentional interference with a contract by interfering with Castronuova's contract.**

98.      The  Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 97 as if fully set forth herein.

99.      To establish a claim of intentional interference with a contractual relationship, the claimant must show (1) a valid contract between claimant and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. The tort is applicable if the defendant knows that the

interference is substantially certain or certain to happen as a result of defendant's actions.

100.    Castronuova maintains a valid employment contract with The Gateway Pundit and works as an independent contractor for Newsmax as a reporter.

101.    Facebook intentionally suspended Castronuova's use of her personal Facebook account. Facebook knew and intended that such action would prevent Castronuova from doing her work as a reporter, real estate agent, prospective elected official and media personality.

102.    Therefore, Facebook intentionally interfered with Castronuova's livelihood and ability to share her work. In the modern world of journalism, employers look at how far a journalist's reach is- in other words their social media influence and ability to garner "views".

103.    Castronuova suffered and is suffering monetary damage for not being able to fulfill her social media duties and share her work.

104.    Castronuova is entitled to monetary relief from Facebook for intentionally interfering with her ability to do her job effectively.

## COUNT VI
### Tortious Interference With A Business Relationship

105.    The allegations in the preceding paragraphs 1 through 104 are incorporated herein by reference.

106.     The elements of tortious interference with a business relationship are "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper

means; and (4) the defendant's acts injured the relationship." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.,* 547 F.3d 115, 132 (2d Cir. 2008).

107.    Castronuova maintains a valid employment contract with The Gateway Pundit and works as an independent contractor for Newsmax as a reporter.

108.    When Facebook suspended Castronuova's use of her personal Facebook account, it knew or should have known that Castronuova's work and her relationship with her employer, business partners, potential clients and potential voters would be disrupted as a result of its negligent actions.

109.    Facebook's act of suspension caused an actual disruption in the Castronuova's business because she could not post content to the site or make other changes in her work.

110.    Therefore, Facebook negligently interfered with Castronuova's prospective economic advantage from her contractual relationships.

111.    Similarly, shadow banning by Twitter had the same effect.

112.    Castronuova suffered and is suffering monetary damage for not being able to fulfill her social media duties.

113.    Castronuova is entitled to monetary relief from Facebook for negligently interfering with the prospective economic advantage.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court enter judgment in hers favor on every claim set forth above and award her the following relief:

A.      Declare that the actions of Murthy, Biden, Facebook, and Twitter constitute a violation of the Free Speech clause by denying Castronuova the ability to speak on Facebook;

B.      Enjoin Murthy and Biden from directing social media companies to censor information with which Murthy and Biden disagree;

C.      Enjoin Facebook and Twitter from removing or suspending posts at the direction of Murthy and Biden;

D.      Enjoin Murthy and Biden from directing social media companies to censor Castronuova's speech;

E.      Enjoin Facebook and Twitter from removing Castronuova's posts or suspending hers ability to post because they disagree with the content of hers posts regarding masks, COVID-;19, or other highly debated topics of the day;

F.      Award Castronuova attorneys' fees and costs, pursuant to 5 U.S.C. § 552(a)(4)(E);

G.      Declare that the actions of Facebook constitute a violation of the Free Speech clause of Federal Statutes and the New York Constitution by denying Castronuova the ability to speak on Facebook;

H.      Award Castronuova damages from Facebook and Twitter for suffering a violation of her federal and state free speech rights and for suffering damages;

I.      Award Castronuova compensatory damages in the amount of her past, present, and future lost income resulting from Facebook's and Twitter's actions of promissory estoppel and resulting from Facebook's intentional interference with a contract and negligent interference with a prospective economic advantage, to wit $10,000,000;

J.      Award Castronuova compensatory damages in the amount of a return of the money she spent on Facebook advertisements because of Facebook's action of promissory estoppel and Facebook's intentional interference with a contract and negligent interference with a prospective economic advantage;

K.      Award Castronuova compensatory damages in an amount to fully compensate Her for the time he spent building a following on Facebook and Twitter that has now been wasted by Facebook's and Twitter's a n d  award Castronuova compensatory damages in the amount of the harm to her reputation resulting from Facebook's and Twitter's actions of promissory estoppel and resulting from Facebook's  intentional interference with a contract and negligent interference with a prospective economic advantage;

L.      Award any further relief to which Castronuova may be entitled, including attorneys' fees and costs.

DATED:

October 5, 2023

New York, NY

Respectfully submitted for the Plaintiff

_____

Richard N. Freeth, Esq.

Freeth & Associates LLC

260 Madison Ave., 8th Fl.

New York, NY 10016

Tel.: 917-775-7082

Email: rfreeth@freethfirm.com